**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **LEWIS SHARPE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 09-0821-WS-B** |
| | ) | |
| **GLOBAL SECURITY** | ) | |
| **INTERNATIONAL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 41). The Motion has been briefed and is ripe for disposition at this time.

**I.      Nature of the Case.**

Plaintiff, Lewis Sharpe, an African-American male, brought this action for employment discrimination and retaliation against defendant, Global Security International d/b/a Global Security Glazing ("GSG"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981. The well-pleaded allegations of the Complaint assert that GSG discriminated against Sharpe on the basis of his race by "paying him lower wages than his white co-workers and whites reporting to him, by demoting him, assigning him harder tasks, by laying him off and by not timely recalling him from layoff." (Complaint (doc. 1), ¶ 17.) As for Sharpe's retaliation claim, the Complaint alleges that plaintiff engaged in protected activity by complaining internally of racially discriminatory pay discrepancies and by filing an EEOC Charge, for which GSG retaliated against him by demoting him, assigning him harder tasks, laying him off, and delaying his recall. (*Id.*, ¶¶ 23-26.)

Defendant now seeks entry of summary judgment in its favor as to all of plaintiff's claims. In the course of briefing the Motion for Summary Judgment, GSG filed a Motion to Strike (doc. 51) the declarations of four witnesses submitted by Sharpe in connection with his response to the Rule 56 Motion. Until the Motion to Strike is resolved, the contours of the

summary judgment record cannot be defined properly; therefore, the Court will examine the Motion to Strike before moving on to the merits of the Motion for Summary Judgment.

## II.    Motion to Strike.

Defendant's Motion to Strike seeks excision of several of plaintiff's witnesses' declarations from the record on three grounds, to-wit: (i) plaintiff failed to disclose the identities of witnesses Leroy Chisenall, Arthur Kelly and Matt Anderson in a timely manner; (ii) the declarations of those three witnesses deviate from statutory requirements because they are not handwritten; and (iii) the declarations of Chisenall, Kelly, Anderson and Justin Brown contain inadmissible hearsay and are improperly conclusory.  Each category of objection shall be addressed in turn.

### A.    *Nondisclosure Objection.*

GSG's first objection is that Sharpe "blind-sided" it by submitting declarations of Chisenall, Kelly and Anderson with his response to the Motion for Summary Judgment, because Sharpe had neither disclosed these witnesses previously nor placed defendant on notice of his intent to utilize them in support of his claims.  Because of plaintiff's omission, GSG laments, it "is stuck in a position where it cannot depose the Declarants, gather any follow-up information based on the Declarations, or refute their testimony."  (Doc. 51, at 6.)  On that basis, defendant requests that these three declarations be stricken pursuant to Rule 37(c), Fed.R.Civ.P., as a sanction for plaintiff's untimely disclosure.

Exhibits appended to the Motion to Strike confirm that Sharpe did not identify Chisenall, Kelly and Anderson as persons believed to have discoverable information in either his initial disclosures or his written discovery responses.  (Doc. 51, Exhs. A & B.)  Those exhibits further demonstrate that plaintiff did not serve Supplemental Rule 26 Disclosures on defendant listing these three witnesses, their contact information, and the type of discoverable information each was believed to have until December 21, 2010, four days after plaintiff filed his response to the Motion for Summary Judgment and long after the discovery deadline.  (Doc. 51, Exh. C.)[1]

---

[1]    In his response to the Motion to Strike, plaintiff states in conclusory fashion that "[b]oth Anderson and Chisenall were identified and made known to Defendant in writing prior to discovery cutoff."  (Doc. 56, at 5.)  The Court does not credit this statement because plaintiff's counsel does not identify the document in which these witnesses were purportedly disclosed, much less append a copy of it to his submission on the Motion to Strike.  More generally, to say (Continued)

The Federal Rules of Civil Procedure provide that if a party fails timely to identify a witness as required by Rule 26(a) or 26(e), "the party is not allowed to use that … witness to supply evidence on a motion … unless the failure was substantially justified or is harmless." Rule 37(c)(1); *see also Mee Industries v. Dow Chemical Co.*, 608 F.3d 1202, 1221 (11th Cir. 2010) ("Rule 37(c) of the Federal Rules of Civil Procedure provides for sanctions against a party that fails to disclose information required under Rule 26(a) or (e)."). In determining whether an undisclosed witness should be excluded under this Rule, courts typically consider "the explanation for the failure to disclose the witness, the importance of the testimony, and the prejudice to the opposing party" of allowing the witness to testify. *Romero v. Drummond Co.*, 552 F.3d 1303, 1321 (11th Cir. 2008); *see also Lips v. City of Hollywood*, 2009 WL 3048895, *11 (11th Cir. Sept. 25, 2009) (similar).

Under the circumstances presented here, the Court exercises its broad discretion by **overruling** defendant's nondisclosure objection. After careful consideration of the parties' filings, the undersigned finds that Sharpe has proffered good-faith explanations for failing to proffer these witnesses sooner. Despite diligence on his part, Sharpe did not locate and contact these witnesses, much less learn that they possessed relevant information, until very late in the game and shortly before filing his response to the Motion for Summary Judgment.[2] There is no reason to believe that plaintiff was sandbagging defendant as to Chisenall, Kelly and Anderson by not disclosing them sooner, much less that plaintiff willfully "misled" defendant "regarding the scope and extent of Plaintiff's evidence," as defendant accuses. (Doc. 51, at 9.) Moreover, given the limited, discrete, and largely ancillary nature of the testimony presented by these three witnesses in their declarations (and defendant's ability to contact and interview these witnesses,

----

that these individuals were mentioned in discovery as co-workers of plaintiff is not tantamount to notifying defendant that these individuals possess discoverable information or that plaintiff intended to use them as witnesses at trial and/or on summary judgment.

[2]     Specifically, plaintiff's counsel, as officers of the Court, offer written representations that it was only shortly before filing their response to the Motion for Summary Judgment that they learned for the first time that Anderson and Chisenall "had relevant testimony to offer." (Doc. 56, at 4, 5.) As for Kelly, plaintiff's counsel assert that they "did not learn until after Defendant filed its Motion for Summary Judgment that Kelly had information relevant to Plaintiff's claims and Defendant's defenses." (*Id.* at 8.)

all of whom are its own former employees, whenever it desires),[3] there is no reason to believe that consideration of these declarations will prejudice defendant in any material way. In Rule 37(c) terms, the nondisclosure of these witnesses was both substantially justified and harmless.

### B.  *Handwriting Objection.*

Defendant's second objection to the Anderson, Kelly and Chisenall declarations is that they are "due to be stricken because they are not hand-written." (Doc. 51, at 10.) According to defendant, 28 U.S.C. § 1746 prohibits typewritten or computer-generated declarations, but instead mandates that the entire declaration must be handwritten to be properly considered. Because the body of each of these declarations is typewritten, with only the signature and date being handwritten, GSG maintains that all these declarations must be stricken.

This argument is a novel one. After all, this Court routinely reviews and considers typewritten declarations on summary judgment, and in fact greatly prefers that format to handwritten declarations that may be afflicted by legibility and penmanship infirmities. The Court does not recall ever fielding an objection that § 1746 mandates exclusion of any declaration whose body is typewritten or computer-generated. If defendant is correct, then the entire bar of this District Court has been doing it wrong for all these years and the judges of this District Court have erred innumerable times by weighing improper declarations. More to the point, applicable authorities do not support GSG's position. Section 1746 does not use the words "handwriting" or "handwritten."[4] At least one appeals court has rejected the interpretation of the statute that GSG champions. *See Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992) ("[W]e believe that the stated purpose of 28 U.S.C. § 1746 is accomplished whether the verification statement is handwritten or typewritten and simply undersigned."). Moreover, the

---

[3]       For that matter, there is no reason to believe that any of these three witnesses are hostile to defendant or that they would not have furnished supplemental declarations to defendant for use in its reply brief had defendant made such a request of them, for the purpose of providing any necessary explanation or clarification of their previous declarations.

[4]       What it says is that if a law or regulation allows a matter to be shown by an affidavit or statement "in writing of the person making the same," then such matter may also be shown via declaration "in writing of such person." 28 U.S.C. § 1746. Defendant places far too much weight on the ambiguous phrase "in writing of such person," and does not identify a single binding or persuasive authority that has construed it in the draconian, impractical manner urged by defendant.

unpublished Eleventh Circuit case on which defendant relies does not expressly require that the entire declaration be handwritten in order to pass muster under § 1746; rather, that decision simply mentions in passing that "[f]ederal law does provide an alternative to making a sworn statement, but requires that the statement *include a handwritten averment, signed and dated*, that the statement is true under the penalties of perjury." *West v. Higgins*, 2009 WL 2993823, *2 (11th Cir. Sept. 21, 2009) (emphasis added). By all appearances, a handwritten signature and date (which these declarations have) would be sufficient to satisfy the *West* interpretation in *dicta* of § 1746 that a "handwritten averment, signed and dated," is necessary.[5] Besides, surely the Eleventh Circuit would have used more fanfare had it intended to construe § 1746 as abolishing the use of typewritten declarations in federal court.

Nor do applicable procedural rules bolster defendant's position. The Federal Rules of Civil Procedure provide that a party may use an "affidavit or declaration" in support of or in opposition to a Rule 56 motion, provided that such an affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Rule 56(c)(4), Fed.R.Civ.P. Nowhere does that rule demand that all declarations be handwritten to be eligible for consideration on summary judgment.

In light of the foregoing, this Court will not adopt GSG's unduly strained interpretation of § 1746. To endorse defendant's position would be to overturn decades of practice in this District Court. Furthermore, it would read into the statute a requirement that is not there, would insist on a pointless anachronism in an age where the use of computers and word processing software is ubiquitous in the legal practice, would impute to Congress a technophobia that does not appear to exist, and would prove deleterious to judicial and litigant eyesight given the indecipherable nature of many witnesses' handwriting. This objection is **overruled**.

---

[5]     *See generally Hosea v. Langley*, 2006 WL 314454, *7 n.14 (S.D. Ala. Feb. 8, 2006) (where defendants objected to declarations under § 1746 because the date field was blank as to day but not month or year, "the Court will not strike these declarations for such a trifling technical defect, where the declarations clearly are in substantial compliance with 28 U.S.C. § 1746").

## C.        Hearsay/Conclusory Statements Objection.

Defendant's third objection to all four declarations is that they contain inadmissible hearsay and conclusory statements not based on the witnesses' personal knowledge. It is certainly true that, to be considered on summary judgment, affidavits or declarations must be based on personal knowledge, cannot be conclusory, and must contain information that can be reduced to admissible form at trial. *See, e.g., Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) ("Even on summary judgment, a court is not obligated to take as true testimony that is not based upon personal knowledge.") (citation omitted); *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210 (11th Cir. 2000) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value.") (citation omitted); *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form.").

With respect to witness Justin Brown, defendant argues that his statements concerning GSG employees' job titles are conclusory, and that his statements reciting what GSG plant manager Mark Woods told him are inadmissible hearsay. The Court disagrees on both fronts. Brown, who worked at GSG on the same line that Sharpe did, can testify about his personal observations and understandings concerning which employees performed what jobs and what their job titles were. Defendant's skepticism concerning the depth of Brown's familiarity with leadman job descriptions and the structural hierarchy of GSG may provide fertile ground for cross-examination, but it does not warrant wholesale exclusion of testimony which appears to be rationally based on the witness's perceptions. And Brown's testimony concerning what Woods told him appears not to be hearsay at all, but rather to be a "statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Rule 801(d)(2), Fed.R.Evid.[6] Also, to the extent defendant

---

[6]        Defendant's barebones suggestion that statements by Woods, acting in his capacity as plant manager, are outside the scope of Rule 801(d)(2) without proof of his "agent or servant" status is not well taken. GSG does not articulate any facially plausible factual or legal reason why Woods (defendant's ranking official overseeing operations at the Selma facility) would not qualify as an "agent or servant" for purposes of that rule. Substantial authority undermines defendant's position. *See generally Ash v. Sambodromo, LLC*, 676 F. Supp.2d 1360, 1372 (S.D. Fla. 2009) (statements of defendant's general manager during course and scope of employment are admissible under Rule 801(d)(2)(D)); *LaBeach v. Wal-Mart Stores, Inc.*, 2009 (Continued)

attempts to invoke the "sham affidavit" rule by pointing out purported inconsistencies between Brown's declaration and a statement he signed in 2009, that argument may call Brown's credibility into question, but it does not implicate admissibility concerns.[7]

As for witness Matt Anderson, defendant interposes a hearsay objection to his declaration's inclusion of statements made by Woods. That objection is unavailing for the reasons previously discussed *supra* with respect to Brown's declaration. Defendant also raises the absence of time frame or context for the alleged conversation in Anderson's declaration. That omission may diminish the utility and value of the declaration, but it neither raises doubt as to the witness's personal knowledge of those events nor requires that the declaration be stricken.[8]

Defendant's objections to the declarations of Kelly and Chisenall on grounds that certain statements therein are conclusory or lack sufficient detail fail for the same reasons as those for the other declarations; therefore the Court will not replicate its previous analysis.

---

WL 902030, *5 (M.D. Ga. Mar. 27, 2009) (store manager's statements are admissible under Rule 801(d)(2)(D)); *McKenzie v. Citation Corp.,* 2007 WL 1424555, *4 (S.D. Ala. May 11, 2007) (statements by defendant's supervisors in performance of their jobs are admissible against defendant under Rule 801(d)(2)(D)).

[7]     The sham affidavit rule is a limited concept that has no application to Brown's declaration as compared to the prior unsworn written statement. *See, e.g., Akins v. Fulton County, Ga.*, 2008 WL 2130748, *3 (11th Cir. May 22, 2008) ("We apply the sham affidavit concept to limited circumstances, and thus, every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence.") (citation and internal punctuation omitted); *Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007) (sham affidavit rule "is applied sparingly because of the harsh effect it may have on a party's case") (citation and internal punctuation omitted). That defendant may have documents impeaching Brown's declaration does not, without more, warrant exclusion of the declaration.

[8]     Defendant's objection appears predicated on the incorrect notion that a declaration is improperly conclusory if the witness states, "Defendant said X," without filling in exact details as to time, place and other circumstances. There is nothing conclusory about a witness's declaration that a party opponent made certain admissions, even if the context of those admissions is not fully presented. A statement that "Defendant said X" is sufficiently specific in its own right to avoid triggering the prohibition on conclusory statements, even without any discussion of context. Of course, failure to provide context may impair the probative value of that statement on summary judgment, but it does not mandate the declaration's eradication from the record.

For all of the foregoing reasons, defendant's Motion to Strike (doc. 51) is **denied** in its entirety. The Court will consider plaintiff's proffered declarations for witnesses Anderson, Kelly, Chisenall and Brown.

## III. Factual Background.[9]

### A. Sharpe's Employment at GSG.

GSG is a security glass manufacturer employing 80 to 100 workers at its facility in Selma, Alabama. (Cotton Dep., at 142; Woods Dep., at 87.) In particular, GSG manufactures laminated glass and polycarbonate products for the security and military industries. (Woods Dep., at 20.) During all relevant times, a nonparty company called Bullet Resistant Glass, USA, LLC ("BRG") leased space from GSG at its Selma facility to manufacture bullet-resistant glass. (Franks Aff. (doc. 41, Exh. D), ¶¶ 1-2.)[10] The record reflects that the two companies' operations

---

[9] The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor. That said, certain of plaintiff's statements of fact are accompanied by citations to record excerpts that do not relate to the factual proposition for which they are cited. As to those items, the Court cannot accept counsel's representations of fact and will not independently examine uncited portions of the record in search of support for a particular proposition. *See, e.g., Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (federal courts "are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it"); *Nieves v. University of Puerto Rico*, 7 F.3d 270, 276 (1st Cir. 1993) ("Factual assertions by counsel in motion papers, memoranda, briefs, or other such self-serving documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment."); Rule 56(c)(1)(A), Fed.R.Civ.P. (litigant on summary judgment asserting that particular facts are or are not disputed "must support the assertion by … citing to ***particular parts of materials in the record***") (emphasis added). On summary judgment, a district court "need consider only the cited materials" in the record. Rule 56(c)(3).

[10] Curiously, plaintiff balks that defendant failed to "disclose the identity of Hilton Franks … in its initial disclosures" (doc. 47, at 3), even though the very exhibit cited by plaintiff identifies Franks as a witness believed to have discoverable information. (Plaintiff's Exh. 35, at 2.) On this record, plaintiff's insinuation of impropriety by defendant with respect to disclosing Franks appears unjustified.

at that facility were intertwined, with workers for one company being supervised by the other and at least some degree of shared oversight and personnel.[11]

Sharpe came to work for GSG in December 2007, when defendant hired him through a temp agency as a general laborer on the BRG line.  (Sharpe Dep., at 36, 39; Franks Aff., at 3.)  Sharpe had no prior experience in the glass manufacturing industry, and his most recent employment had been in a non-managerial position in a shipping department.  (Sharpe Dep., at 14-21, 27-28.)  As a laborer, Sharpe worked under Josh Batchelor, a white male whom defendant designated as the "lead man" on the BRG line.  (Sharpe Dep., at 40; Batchelor Dep., at 64; Franks Aff., at 2.)  Batchelor's job duties as lead man included training employees to perform their jobs on the BRG line.  (Batchelor Dep., at 19.)  Batchelor in turn reported to Mark Woods, GSG's plant manager responsible for supervising all production operations.  (Batchelor Dep., at 10-11; Franks Aff., at 2; Woods Dep., at 84.)  Batchelor characterized Sharpe as an employee in whom he felt a certain level of "trust and confidence" to help him with the crew, and indicated that Sharpe would help out to a greater degree than other laborers.  (Batchelor Dep., at 20, 21-22, 63.)  According to Batchelor, Sharpe always did good work and whenever Batchelor asked him to do something, he would do it.  (*Id.* at 25.)

There is considerable divergence between the parties concerning Sharpe's job title after he became a permanent employee in spring 2008.  In the light most favorable to plaintiff, the record shows that Sharpe was designated a lead person on the BRG line.  (Sharpe Dep., at 29 ("I was the lead man at BRG.").)  In particular, Sharpe testified that, sometime after he became a permanent employee in March 2008, both Hilton Franks (the owner of BRG) and plant manager Woods informed him that he was a lead person (otherwise known as "leadman") on the BRG

---

[11]     The parties have not suggested that there is any meaningful distinction between GSG operations and BRG operations that would affect the Rule 56 analysis in this case (*i.e.*, there has been no contention that GSG does not qualify as Sharpe's "employer" within the meaning of Title VII, that BRG rather than GSG engaged in the conduct at issue, or that the conduct of one entity can or cannot be imputed to the other for liability purposes herein).  Accordingly, the Court will not delve into a nuanced factual or legal examination of the scope and limits of the synergies between the two entities.  Those intricacies and nuances simply are not material to the Motion for Summary Judgment as framed.  For purposes of this Order, it suffices to note that GSG assigned certain workers to the BRG line, and that workers on the BRG line reported to GSG's plant manager, such that there was significant operational and personnel integration between the two companies at that location.

line.  (*Id.* at 43, 61-63.)  This testimony is corroborated by other evidence of record, and will be accepted as true for summary judgment proposes.[12]  To a large degree, this lawsuit revolves around Sharpe's contentions that Woods took his job away by giving his leadman position to a white employee whom Sharpe had trained, and reassigning Sharpe to a less desirable, more burdensome glass-bagging job.  (*Id.* at 101.)

Although his job duties have changed and he experienced a layoff in 2009 for a period of several months, Sharpe evidently remains employed at GSG as a laborer today.

### B.   *Compensation Issues.*

Because plaintiff's claims include allegations of racially discriminatory pay practices, the wage history of Sharpe and the alleged comparators is of some significance.

When Sharpe first arrived at GSG as a temporary worker, he was paid at the rate of $8.00 per hour.  (Defendant's Exh. H.)  Sharpe received a $1.00 hourly raise (to $9.00 per hour) when he became a permanent employee in March 2008.  (Sharpe Dep., at 40; Woods Dep., at 283.) Sharpe received a 50-cent raise in May 2008, another 25-cent raise in September 2008, and a 10-cent raise in April 2009.  (Woods Dep., at 284.)[13]  These facts are corroborated by GSG's payroll records.  (Plaintiff's Exh. 9.)  Plaintiff contends that the 50-cent raise in May 2008 coincided

---

[12]      Defendant argues that Batchelor was the sole BRG leadman, but defendant's own documents describe Justin Brown as "BRG Lead Person" after Sharpe's duties were re-assigned to him.  (Plaintiff's Exh. 25; *see also* Plaintiff's Exh. 31 (referring to Brown as "a lead person").) To be sure, defendant's witnesses attempt to explain away these documents.  At the very least, however, they create genuine issues of fact as to whether Sharpe was ever a lead person and whether Brown received that title after Sharpe's duties were transferred to him.  Also, several other witnesses testified that Woods and other defendant managers or supervisors had indicated that Sharpe was a leadman on the BRG line.  (Waller Dep., at 33-34; Anderson Decl., ¶¶ 5, 7; Brown Decl., ¶¶ 3-5.)  It would be improper at this juncture for the Court to pick and choose among the conflicting evidence to decide which of competing inferences should be credited. While defendant may be able to convince a jury that Sharpe was never given the position of leadman on the BRG line, the disputes on that score preclude the Court from crediting defendant's version at this time.

[13]      Plaintiff's evidence is that this 10-cent raise was administered in stages. According to Sharpe, he received a 5-cent raise in early 2009.  (Sharpe Dep., at 64-65, 99.)  A short time later, and after he complained about shoddy treatment when defendant read his performance evaluation in the presence of other employees, GSG upped the raise to 10 cents, bringing his total hourly wage to $9.85.  (*Id.* at 157.)

with his promotion to leadman. (Sharpe Dep., at 62.) Because of these four pay increases, Sharpe was being paid $9.85 per hour as of September 2010. (*Id.* at 55.)

According to Sharpe, two white employees that he supervised, including Justin Brown and "[t]his guy named Matt," were paid more than he was. (Sharpe Dep., at 65-67.) With respect to the "guy named Matt," a white employee named Matthew Anderson worked as a laborer for defendant, and was paid the hourly rate of $9.50 during the period of August 2008 through March 2009. (Plaintiff's Exh. 33.) As for Brown, in January 2009, defendant rehired a white employee named Justin Brown to be a laborer on the BRG line. (Cotton Dep., at 67-69.) Brown had previously worked for GSG as "a supervisor with plant-wide responsibilities," such that Lance Cotton, GSG's President of Operations, "trusted him to make decisions." (*Id.* at 69.)[14] Woods viewed Brown as "a good dependable solid person" who was "a go-getter." (Woods Dep., at 239.) Upon rehire, Brown's job duties were initially no different than those of any other laborer; however, Woods and Cotton decided to pay Brown substantially more than the typical hourly rate given to new laborers on the BRG line. (Cotton Dep., at 69-71.) Thus, Brown was rehired at an hourly rate of $10.00, and subsequently received raises to $10.35 in April 2009, and to $11.13 in September 2009 upon being promoted. (Plaintiff's Exhs. 13, 15.)

### C. Job Duty Issues.

When he became leadman on the BRG line in approximately May 2008, Sharpe's job was to "[m]ake everything just run straight" and on schedule, and to "[m]ake sure everybody do what they [are] supposed to do" on the line, especially when Batchelor was not present. (Sharpe Dep., at 44-45.) In that capacity, Sharpe gave orders to other employees and inspected their work to verify that it was properly done. (*Id.* at 67-68.) He also arrived earlier than other employees "to set up everything" on the line, and either he or Batchelor performed those duties each morning. (*Id.* at 53-54.) In the event of a problem, Sharpe went straight to the plant manager, Woods, not to any intermediate supervisors. (*Id.*)

There came a time when defendant ousted Sharpe from his leadman position. Indeed, in January 2009, Sharpe was taken aback when Justin Brown, a white subordinate whom Sharpe had trained, directed him to get on a forklift and move a crate. (Sharpe Dep., at 74-76, 80.)

---

[14]     According to Woods, Brown had previously left GSG's employ "on good terms" and "had done a good job with us in the past." (Woods Dep., at 292.)

Sharpe complained to Woods that Brown should not be telling him what to do. In response, Woods confirmed that he had demoted Sharpe and replaced him with Brown. (*Id.* at 76-77, 87.) The Court understands that defendant's evidence conflicts with the foregoing; however, Sharpe's testimony is unequivocal that defendant placed Brown in his lead person position. (*Id.* at 86.) For summary judgment purposes, then, it will be assumed that Sharpe was a leadman from May 2008 through January 2009, at which time defendant removed him from that position and assigned his duties to a white employee (Brown) that Sharpe had previously supervised and trained.[15]

The change from leadman to laborer was not the only adverse job action that Sharpe confronted at that time. Later in January 2009, defendant moved Sharpe off the BRG line and onto the bagging station on the laminating line on the GSG side of the operation. (Woods Dep., at 268, 280.) In explaining this decision, Woods testified that Sharpe "was a good worker most of the time," but he "was just not as focused as often as he should be" and "[h]e was a complainer." (*Id.* at 279.) On that basis, Woods decided that "a change of scenery" might be beneficial and that maybe Sharpe's "attitude would change" with a new assignment. (*Id.*) Sharpe's new job entailed "bagging glass, checking glass, wrap the glass, tape glass, and bagging." (Sharpe Dep., at 101-02.) In the bagging department, Sharpe did not oversee anyone else's work, but simply had to "do what they told [him] to do." (*Id.* at 103.) According to Sharpe, the bagging job was more unpleasant and more onerous than his previous job duties because his hands blistered, it was so hot in that area that workers would "cramp up," the fan at that location provided no relief from the heat, and the work entailed lifting heavy glass, sometimes without aid of a crane or hoist. (*Id.* at 104.) Sharpe further testified that there was only one white employee in the entire bagging section. (*Id.* at 111.) By all appearances, Sharpe remains employed in GSG's bagging station on the laminating line at this time.

### D. Complaints of Discrimination.

Plaintiff complained to defendant for quite some time that "White employees make more than [he]" did. (Sharpe Dep., at 72.) Sharpe's testimony was that he complained internally

---

[15] Sharpe testified that there were no problems with the product on the BRG line at the time of his demotion. (Sharpe Dep., at 77.) Plaintiff's position is that his demotion was not based on his own performance.

about alleged race discrimination by defendant no later than December 2008. (*Id.* at 74-79.)[16] According to plaintiff, he "started complaining in December when stuff was done … [t]hen it got worser [*sic*] in January when [Woods] called me to the office." (*Id.* at 78-79.) Also, despite ambiguity in other respects, Sharpe's testimony is clear that he complained to Woods of race discrimination when he was removed from his lead position and replaced with Brown, which happened in January 2009. (*Id.* at 77-78.)

Many of Sharpe's internal complaints centered on his perception that defendant was not paying him enough. Indeed, defendant acknowledges that, even before his discrimination charge, Sharpe objected to GSG's human resources manager that another employee on his line was being paid substantially higher wages than he was, and that he wanted a raise. (P. Woods Dep., at 80-81.) At that time, however, the HR manager did not understand Sharpe to be complaining of race discrimination. (*Id.* at 81.) Likewise, in late January 2009, Sharpe complained to Lance Cotton about his pay, saying that he needed more money because he could not pay his bills. (Cotton Dep., at 17-18, 106.) At that time, Sharpe also complained to Cotton about his reassignment to the bagging area, which he felt was "unfair." (*Id.* at 19, 106.) This evidence does not reveal a racial dimension to these particular internal complaints.[17]

---

[16]    When defense counsel asked him to confirm that his first complaint of race discrimination to GSG occurred in January 2009, Sharpe answered, "No. … I started complaining in December …." (*Id.* at 78.)

[17]    Plaintiff testified that he had written a letter to Cotton in or around January 2009; however, that letter is not in the record. Moreover, there is no evidence as to the contents of that letter. Sharpe indicated he could not recall anything he had written in the letter and Cotton testified that he had never received it. (Sharpe Dep., at 144-45; Cotton Dep., at 57.) Although plaintiff asserted at one point that his letter to Cotton did complain of race discrimination, Sharpe's deposition testimony on this point directly conflicted with his testimony earlier in that deposition. (*Compare* Sharpe Dep., at 144-45 (stating that he remembers "nothing" about the contents of his letter to Cotton) *with* Sharpe Dep., at 226 (stating that letter complained about "[d]iscrimination, racist").) Plaintiff has not explained the obvious inconsistency or justified any improper request that the Court credit one aspect of his testimony and discredit another part on summary judgment. *See generally Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) ("Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided."). Besides, even if Sharpe did send a letter to Cotton complaining of race discrimination, the uncontroverted evidence is that Cotton never received it; therefore, that letter could not have placed Cotton on notice of the racial component of plaintiff's dissatisfaction.

Nonetheless, Sharpe's testimony is clear that other times beginning in December 2009, he did couch his complaints in the language of race discrimination.

On or about February 9, 2009, Sharpe filed a Charge of Discrimination against GSG with the Equal Employment Opportunity Commission. (Plaintiff's Exh. 34.) In that Charge, Sharpe complained of race discrimination and retaliation, on grounds that (a) he was paid less than certain white employees that he supervised; and (b) Woods became hostile to him after he complained about racially discriminatory pay, by threatening him and demoting him. The EEOC sent notice of Sharpe's Charge to GSG's offices in Selma on February 10, 2009. (*Id.*) Woods was notified of Sharpe's EEOC Charge after GSG's human resources office received it in the mail. (Woods Dep., at 171; P. Woods Dep., at 56-57.) In late February 2009, Cotton met with Woods and the HR manager to inform them of Sharpe's EEOC Charge. (Cotton Dep., at 27-30.) As such, Woods and other GSG officials on-site in Selma were unquestionably aware of plaintiff's EEOC Charge as of late February 2009.

Even after filing his EEOC Charge, Sharpe continued to complain about pay to defendant's officials. (Woods Dep., at 281.)

### E.    *Performance / Disciplinary Issues.*

Beginning in fall 2008, GSG documented a series of difficulties with Sharpe's job performance and demeanor. In October 2008, Woods placed a memo in Sharpe's file indicating that Batchelor had complained that Sharpe was not helping him to direct the employees. (Defendant's Exh. I.) In November 2008, Woods placed a second memo in Sharpe's file stating that Batchelor continued to express dissatisfaction with Sharpe's failure to direct workers' activities. (Defendant's Exh. K.)[18]

At various times before Sharpe was transferred off the BRG line, GSG's human resources manager personally observed Sharpe displaying an "unwillingness to be a team member, to try to fix the problems that were going on." (P. Woods Dep., at 75-76.) The HR manager witnessed

---

[18]    Sharpe's testimony is that the only time anyone at GSG/BRG complained to him that he was not doing his job correctly was when Brown asked him to do lead person work after Brown had taken Sharpe's job, which Sharpe refused on the ground that he did not wish to perform Brown's duties for him. (Sharpe Dep., at 146-47.) That said, Sharpe admitted having talked back to Brown and Batchelor from time to time, saying, "I always speak up. I still do my job. I still tell you how I feel about it." (*Id.* at 148.)

Sharpe being angry on the BRG line and grumbling that "you can't work with these folks," but refusing to provide specifics. (*Id.* at 76.)

According to defendant, the problems with Sharpe's attitude and cooperativeness became more pronounced over time. In January 2009, Sharpe attended a meeting with Woods and several other people concerning a specific production defect.[19] At that time, Sharpe confronted Woods, saying, "I was the lead man, all the sudden I got to move down, why I got to move down." (Sharpe Dep., at 89.) Although the meeting was ostensibly to address a serious customer complaint, defendant's records show that Sharpe became loud and irate, insisting that he was good at his job, that he wanted a raise, and that defendant just wanted to get rid of him. (Plaintiff's Exh. 17; Woods Dep., at 264-65.) Woods' response was, essentially, that if Sharpe did not like it, he could "hit the time clock," presumably meaning that he could leave. (Sharpe Dep., at 90.) Much of this contentious discussion was reiterated in a one-on-one meeting between Sharpe and Woods later that same day, with Woods notifying Sharpe that if he could not take orders from Brown, then Sharpe needed to find another job. (*Id.* at 93-94.) Plaintiff characterizes the tone of both conversations as argumentative. (*Id.* at 80, 89-97.) After those meetings, Woods came out onto the facility floor to watch Sharpe work, in a manner that Sharpe construed as "just intimidating, wanting me to say something to him or go off on him so he could fire me." (*Id.* at 96-98.) After that day, however, Sharpe never experienced another problem with Woods. (*Id.* at 95, 98, 144.)

Woods characterized Sharpe as an employee who often complained about "external things," such as "[w]hat somebody else was getting paid, who's working harder than someone else." (Woods Dep., at 268.) According to Woods, these complaints intensified over time, and continued even after Sharpe was transferred to the bagging department in January 2009. (*Id.* at 268, 280.) In April 2009, defendant issued a Significant Incident Report to Sharpe based on observations of holes in the bags that Sharpe had prepared, asserting that he had failed to follow

---

[19]      The impetus for this meeting was that a BRG customer (General Dynamics) had discovered a problem on the BRG line that had resulted in several hundred pieces being made incorrectly. (Woods Dep., at 230, 233-35.) Woods did not fault Sharpe specifically for this problem, but instead attributed it to the entire crew. (*Id.* at 289.) Nonetheless, when Brown directed Sharpe to take certain corrective actions, Sharpe responded, "I'm not doing anything. If [Woods] wants something done, you tell him to come tell me." (*Id.* at 240.)

proper bagging procedures.  (Plaintiff's Exh. 21.)  Sharpe denies having improperly bagged glass, and protests that he was never written up for such problems before he complained of race discrimination.  (Sharpe Dep., at 158-60.)

In or about April 2009, defendant singled Sharpe out by reading his unflattering performance evaluation to him on the floor, in the presence of other line employees. (Defendant's Exh. U; Sharpe Dep., at 154-57.)  Sharpe said that he was "down and upset" after this incident, which he likened to an "assault," with "everybody laughing and thought it was a joke" at his expense.  (Sharpe Dep., at 155-56.)  In this regard, Sharpe was treated differently than his co-workers.  (*Id.* at 157.)  Plaintiff contends that defendant doubled his raise (from 5 cents to 10 cents) after he objected to this unfair and humiliating treatment with respect to the public airing of his performance evaluation.

### F.      *Layoff and Recall Issues.*

Finally, because Sharpe imputes discriminatory or retaliatory intent to his layoff and the timing of his recall, the Court summarizes the record facts concerning those events.

With respect to the June 2009 layoffs, defendant's evidence is that Lance Cotton decided layoffs were needed at the GSG facility in Selma.  (Cotton Dep., at 77.)  In implementing that layoff, however, Mark Woods was the decision-maker, deciding in "his discretion … specifically which department or which people would be laid off" after Cotton indicated that layoffs were necessary.  (*Id.* at 46.)  Similarly, when it was appropriate to call employees back from layoff, it was Woods who "decide[d] to call them back."  (*Id.* at 49.)  Cotton was hands-off in this implementation process, and neither decided nor was consulted about specific persons or the racial composition of those selected for layoff; indeed, he did not even learn that Sharpe had been laid off and recalled until after this lawsuit commenced.  (*Id.* at 78, 151.)  Those decisions were made solely by Woods.  (*Id.* at 151.)  GSG does not have any specific guidelines or policies governing implementation of layoffs.  (Woods Dep., at 318-19.)

Sharpe was a victim of that June 2009 layoff.  (Sharpe Dep., at 165.)  Defendant's records show that Sharpe was laid off on June 2, 2009, and recalled on September 21, 2009. (Plaintiff's Exh. 24.)  Of the nine employees (including Sharpe) who were laid off on June 2, 2009, six were black, three were Asian, and zero were white.  (*Id.*)  More broadly, defendant laid off 32 employees (of whom 21 were black, 8 were white, and 3 were Asian) on June 2 and 3, 2009, and recalled all 32 of them during the following four months.  (*Id.*)  Some 26 of those laid-

off employees (*i.e.*, all but six) were recalled by no later than mid-July 2009. (*Id.*) All six of the employees recalled after July 21, 2009 were African-American. (*Id.*) Sharpe was one of three employees recalled on September 21, 2009, and just two employees were recalled after that date, with one of those individuals turning down the recall because he had accepted other work. (*Id.*) As such, Sharpe was one of the last employees to be recalled, and his recall date was more than two months later than that of most of his colleagues (and all of his white colleagues). Upon his recall, Sharpe was returned to the bagging job he had held previously. (Sharpe Dep., at 169.)

## IV.    **Summary Judgment Standard.**

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

**V.      Analysis.**

   *A.      The* **McDonnell Douglas** *Analysis.*

The Complaint frames plaintiff's claims as sounding under both Title VII and § 1981; however, the same analysis governs both sets of claims. "Because the legal standards governing each of these categories of claims are the same, it is unnecessary to evaluate separately the Title VII … and the Section 1981 causes of action." *Pears v. Mobile County*, 645 F. Supp.2d 1062, 1089 (S.D. Ala. 2009); *see also Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (for disparate treatment claims under both Title VII & § 1981, "the legal elements of the claims are identical" such that the two categories of claims need not be discussed separately).

Absent direct evidence of discrimination or retaliation, Sharpe must make a showing of circumstantial evidence that satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[20]  Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race discrimination and/or retaliation.  If he does so, that showing "creates a rebuttable presumption that the employer acted illegally." *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11th Cir. 2005).  At that point, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. ... If the employer does this, the burden shifts back to the

---

[20]      In his summary judgment brief, Sharpe maintains that Woods harbors discriminatory animus toward African-American employees.  In particular, plaintiff cites declarations of Brown, Kelly and Chisenall indicating that on one occasion Woods referred to an African-American as a "monkey" and said he was "tired of all the monkeys in here," that on another occasion he referred to a black employee as "this," and that on a third occasion Woods told a white applicant that "he was looking for people like me to change the face of the company," which the applicant construed as having a racial meaning.  (Doc. 47, at 11; Plaintiffs' Exhs. 6, 8, 23.)  Notwithstanding this evidence, plaintiff has not couched this case as a "direct evidence" case but has instead applied the *McDonnell Douglas* paradigm.  The Court will not *sua sponte* examine or develop a "direct evidence" theory that plaintiff elected not to pursue, but will instead consider this evidence in the framework of the pretext analysis under *McDonnell Douglas*, without considering whether it might be sufficient to remove this action from the confines of circumstantial proof altogether.  That said, it bears noting that any effort to posture this case as one predicated on direct evidence of discrimination would have confronted a daunting proof threshold.  *See, e.g., Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) ("[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race] ... constitute direct evidence of discrimination.") (quotation marks omitted).

plaintiff to show that the employer's stated reason was a pretext for discrimination." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (citations and internal quotation marks omitted); *see also Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (outlining similar procedure for Title VII retaliation claims). A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007).

Rather than working through each prong of the *McDonnell Douglas* analysis sequentially, defendant attacks three discrete aspects of Sharpe's claims on summary judgment. Because the briefing is framed in this manner, the Court will not *sua sponte* navigate the *McDonnell Douglas* framework from beginning to end, parsing the record to expand on movant's arguments or to formulate new ones, but will instead focus on the particular grounds for summary judgment advanced by GSG.[21] Those specific bases for summary judgment are as follows: (i) whether plaintiff can show an "adverse employment action" as required for his discrimination and retaliation claims; (ii) whether plaintiff has shown a similarly situated comparator for his wage discrimination claims; and (iii) whether the layoff and recall are actionable under the circumstances of this case. Each of these issues will be addressed in turn.

**B.      Whether Plaintiff Suffered an Adverse Employment Action.**

To establish a *prima facie* case of either disparate treatment or retaliation, Sharpe must show an adverse action. *See, e.g., Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that … he suffered a materially adverse action ….") (citations omitted); *Crawford*, 529 F.3d at 970 ("To make out a *prima facie* case of racial discrimination a plaintiff must show

---

[21]      *See generally Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.") (citation and internal quotation marks omitted).

… she was subjected to adverse employment action ….").  The parties dispute whether Sharpe has satisfied that burden here.

### 1.   Legal Standard for Adverse Employment Action.

As a threshold matter, it is important to recognize that the "adverse action" test applied to retaliation claims is distinct from that applied to disparate treatment claims.  Defendant's principal brief does not recognize this distinction but instead urges application of the stricter disparate treatment iteration to all of plaintiff's claims.  Such an approach would be improper and contrary to binding precedent.  *See Crawford*, 529 F.3d at 973-74 & n.14 (explaining that under new test for adverse action in retaliation context, "the type of employer conduct considered actionable has been broadened," the new standard for adverse action in retaliation cases is "decidedly more relaxed" and "accords an employee protection from a wider range of retaliatory conduct," and "while the new standard … applies to Title VII retaliation claims, it has no application to substantive Title VII discrimination claims"); *Pears*, 645 F. Supp.2d at 1094 (recognizing a "more stringent standard for adverse employment actions in discrimination claims" and a "more liberal standard applicable in the retaliation setting").  It is therefore instructive to delineate separately the proper tests for this element of the race discrimination *prima facie* case and the retaliation *prima facie* case.

In the Title VII discrimination context, "[n]ot all employer actions that negatively impact an employee qualify as adverse employment actions."  *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) (citation and internal quotation marks omitted).  Rather, "only those employment actions that result in a *serious and material* change in the terms, conditions, or privileges of employment will suffice. … [T]he employment action must be materially adverse as viewed by a reasonable person in the circumstances."  *Id.* (citations and internal quotation marks omitted).[22]

---

[22]      In determining whether the requisite level of adversity is reached, it is necessary to examine the alleged adverse actions in the aggregate.  *See, e.g., Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1301 (11th Cir. 2005) ("In deciding whether employment actions are adverse, we consider the employer's acts both individually and collectively."); *Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1118 (11th Cir. 2001) ("While the other actions might not have individually risen to the level of adverse employment action under Title VII, when those actions are considered collectively, the total weight of them does constitute an adverse employment action.").

By contrast, the test for an adverse employment action in retaliation cases is whether the employer's conduct "might deter a reasonable employee from pursuing a pending charge of discrimination or making a new one." *Crawford*, 529 F.3d at 974. Thus, in the retaliation context, a "materially adverse action" is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (citation omitted). In this regard, the Eleventh Circuit has read applicable Supreme Court precedent as "strongly suggest[ing] that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." *Id.* at 973 n.13.[23]

### 2. The Demotion and Transfer.

The adverse actions identified by Sharpe are his removal from the position of leadman and subsequent reassignment as a laborer in the bagging department. Defendant argues that these allegations are legally insufficient to constitute an adverse employment action because (i) Sharpe was never a leadman so he could not have been demoted, (ii) the alleged demotion predates his EEOC Charge and therefore could not be retaliatory, (iii) if it occurred, the demotion is not an adverse employment action as a matter of law, and (iv) a lateral transfer to the bagging department is not an adverse employment action as a matter of law. These contentions are not persuasive.

With respect to defendant's argument that Sharpe was never a leadman and therefore was never demoted, the record in the light most favorable to plaintiff is to the contrary. Plaintiff's testimony is unequivocal that defendant employed him as a leadman, that Woods (the plant

---

[23]     Under the current test, retaliatory conduct need not be workplace- or employment-related to satisfy this element. *See Crawford*, 529 F.3d at 973 ("the type of employer conduct considered actionable has been broadened … to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related"). Thus, strictly speaking, the "adverse employment action" requirement for retaliation cases is more accurately characterized as a "materially adverse action" requirement, yet the Eleventh Circuit has continued to use the former (and now ill-fitting) terminology. *See, e.g., Dixon v. The Hallmark Companies, Inc.,* 627 F.3d 849 (11th Cir. 2010) ("To establish a *prima facie* case of Title VII retaliation, the Dixons must show that … they suffered a materially adverse employment action"); *Jackson v. Winn-Dixie*, 2008 WL 5435576, *10 n.17 (S.D. Ala. Dec. 31, 2008) ("The Eleventh Circuit's continued usage of the term, 'adverse employment action,' in describing a *prima facie* case of retaliation appears anachronistic."). The Court will adhere to this Eleventh Circuit nomenclature for purposes of this Order.

manager) specifically notified him of this job title,[24] and that Woods demoted him and replaced him with a white employee (Brown) in January 2009. Other witnesses, including Brown himself, reinforce plaintiff's assertions. Whether Sharpe ever held the leadman position or not is hotly disputed by the parties, and defendant has both evidence and arguments contradicting plaintiff's position that he did. For summary judgment purposes, however, the Court cannot make credibility determinations or pick and choose among conflicting pieces of evidence, but must instead accept all of plaintiff's evidence as true. Therefore, defendant's contention that "the alleged demotion did not occur because BRG/GSG did not promote Sharpe" (doc. 41-1, at 20) to be a leadman in the first place is unavailing on summary judgment, inasmuch as there are obvious, glaring genuine issues of material fact as to whether defendant did or did not place Sharpe in the leadman job in spring 2008.

GSG's next argument is that Sharpe's demotion and ensuing transfer to the bagging section cannot support his retaliation claim because those events predated his EEOC Charge. Defendant's chronology is correct, as is its reasoning that an employer cannot be held liable for Title VII retaliation when the alleged retaliatory acts preceded the protected conduct. *See, e.g., Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999) ("[a]t a minimum, [a plaintiff] must show that the adverse act followed the protected conduct"). But the EEOC Charge is not the only protected conduct invoked by Sharpe here; rather, his evidence is that he began complaining internally of race discrimination no later than December 2009. Internal complaints of discrimination plainly qualify as protected conduct for Title VII retaliation purposes. *See, e.g., Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) (deeming plaintiff's letter to company official complaining of discrimination based on Cuban origin to be statutorily protected activity); *DeLeon v. ST Mobile Aerospace Engineering, Inc.*, 684 F. Supp.2d 1301, 1324 (S.D. Ala. 2010) ("Statutorily protected expression includes complaining to superiors about harassment in the work place, lodging complaints with the EEOC and participating in discrimination-based lawsuits."); *King v. Alabama Dep't of Public Health*, 2010 WL 3522381,

---

[24] As discussed *supra* in the context of the Motion to Strike, any such statement by Woods would be admissible against GSG as an admission of a party-opponent. *See* Rule 801(d)(2)(D), Fed.R.Evid. (classifying as non-hearsay "a statement by the party's agent or servant concerning a matter made within the scope of the agency of employment, made during the existence of the relationship").

*8 n.21 (S.D. Ala. Sept. 2, 2010) ("it is well settled that a good-faith (even if not meritorious) internal complaint of race discrimination … constitutes protected activity under Title VII"). Therefore, the Court will not exclude the demotion and transfer from the retaliation analysis based on temporal sequencing considerations.  In the light most favorable to plaintiff, the record shows that he indeed engaged in protected activity prior to those alleged adverse employment actions.

GSG also maintains that the demotion and transfer do not meet the legal definition of adverse employment actions because those kinds of personnel actions are not materially adverse. Recall that plaintiff's evidence is that he went from being a leadman in a position of responsibility and prestige, directing and inspecting the work of other employees on the BRG line, to being a mere laborer, and was subsequently transferred to the bagging section, where he gives orders to no one and performs backbreaking labor that blisters his hands in an uncomfortably hot, unpleasant environment.  The demotion, in and of itself, is plainly an adverse employment action under even the more stringent standard applicable to substantive discrimination claims.  *See, e.g., Crawford*, 529 F.3d at 970 (adverse employment actions include "ultimate employment decisions … such as termination, failure to hire, or demotion"). And a transfer can meet the threshold of material adversity "if it involves a reduction in pay, prestige or responsibility."  *Hinson v. Clinch County, Georgia Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000).  Plaintiff's record facts show that his transfer to the bagging section was accompanied by a substantial loss of prestige and responsibility, and a substantial increase in physical demands.  Considering the demotion and transfer in the aggregate, as applicable law requires, the Court readily concludes that plaintiff has presented sufficient evidence of an adverse employment action to satisfy his *prima facie* burden.  *See McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1078 (11th Cir. 1996) (adverse employment action requirement satisfied where supervisor was reassigned to janitorial duties and then transferred to shipping department, where he was required to perform physically strenuous tasks); *Jackson v. Winn-Dixie, Inc.*, 2008 WL 5435576, *5-6 (S.D. Ala. Dec. 31, 2008) (reasonable factfinder could find that plaintiff experienced adverse employment action where plaintiff "was transferred to an entirely different

and less prestigious job in a different department, with substantially different duties, on a permanent basis").[25]

The Court's conclusion that Sharpe has made an adequate showing of adverse employment action to support his race discrimination claims applies with greater force to his retaliation claims, where the required level of severity is markedly lower. On this record, a reasonable fact finder could conclude that Sharpe was demoted and transferred from a position of trust, respect, and responsibility, to a menial, physically arduous and undesirable job with unpleasant working conditions. Such a demotion / transfer qualifies as a materially adverse action for retaliation purposes because it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Crawford*, 529 F.3d at 974.

For all of these reasons, the Court finds that the Motion for Summary Judgment is not meritorious insofar as defendant maintains that Sharpe did not experience an adverse employment action in January 2009 as needed to establish a *prima facie* case of race discrimination or retaliation.[26]

---

[25]    In attempting to distinguish *McNely* and other like authorities, GSG insists that Sharpe experienced merely a lateral transfer, much like the plaintiff in *Njie v. Regions Bank*, 198 Fed.Appx. 878, 883 (11th Cir. Sept. 22, 2006), who was transferred from branch manager at one bank location to branch manager at another. Viewed in the light most favorable to Sharpe, the record shows that his circumstances are much closer to those in *McNely* than in *Njie*. Plaintiff testified that he went from being a respected leadman directing operations on the BRG line, to working as a common laborer in the bagging area under physically oppressive and grueling conditions with no supervisory responsibility over anyone. If plaintiff's evidence is accepted as correct, then what GSG did to him in January 2009 was far more injurious than a mere lateral transfer of a bank branch manager from one branch to another.

[26]    In its reply brief, defendant unveils a new argument that "GSG is still due summary judgment on the claims related to the transfer because GSG has demonstrated that M. Woods made the decision based on Sharpe's reported disruptive attitude and insubordination, not his race." (Doc. 52, at 12.) Nowhere in defendant's principal brief did it request summary judgment of Sharpe's transfer-related claims on that basis. (*See* doc. 41-1, at 18-22.) Because it is improper for defendant to raise this new argument in its reply brief, that argument will not be considered. *See, e.g., Nelson v. La Crosse County Dist. Atty. (State of Wisconsin)*, 301 F.3d 820, 836 (7th Cir. 2002) ("It is well settled that issues raised for the first time in a reply brief are deemed waived."); *North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 713 F. Supp.2d 491, 526-27 (M.D.N.C. 2010) ("To the extent Plaintiffs seek to raise in a reply brief arguments not addressed in their opening brief or raised by Defendants' response, the court would not consider such arguments on the grounds they were not fairly raised."); *PrecisionIR Inc. v. Clepper*, 693 F. Supp.2d 286, 291 n.2 (S.D.N.Y. 2010) (where defendants raised new (Continued)

### C.      Whether Plaintiff Has Identified a Comparator for Discriminatory Pay Claim.

Among Sharpe's claims is one for race discrimination in pay.  To establish a *prima facie* case of intentional discrimination in compensation, Sharpe must establish that: (i) he belongs to a racial minority; (ii) he received low wages; (iii) similarly situated comparators outside the protected class received higher compensation; and (iv) he was qualified to receive the higher wage.  *See Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004).  On summary judgment, GSG seizes on the "similarly situated comparators" requirement, and maintains that Sharpe cannot make such a showing.

As a general proposition, "[w]hen comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects besides race."  *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1273 (11th Cir. 2004).  In the context of a wage discrimination claim brought under Title VII (rather than the Equal Pay Act, which has no application here), however, the "similarly situated" criterion is interpreted less stringently.  In this context, a plaintiff satisfies his *prima facie* burden of comparability simply by showing that he "occupies a job similar to that of higher paid" persons outside the protected class.  *Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (citation omitted); *see also Ledbetter v. Goodyear Tire and Rubber Co.*, 421 F.3d 1169, 1186 (11th Cir. 2005) (similar).  Sharpe maintains that he can satisfy this burden by pointing to two white comparators, namely Matt Anderson and Justin Brown.

#### 1.      Matt Anderson as Comparator.

The record reflects that GSG hired Anderson in May 2008 as a laborer on a temporary basis, paying him $8.50 per hour.  (Plaintiff's Exh. 11, at 3.)  Defendant gave Anderson a raise to $9.50 in August 2008, when it hired him as a permanent worker.  (*Id.* at 2; Plaintiff's Exh. 33, at 3.)  Sharpe contends that Anderson's pay history reflects race discrimination because when plaintiff was hired as a temporary employee in December 2007, he was paid just $8.00 per hour

---

arguments in summary judgment reply brief, "[t]he Court will not consider Defendants' expanded, procedurally-improper arguments"); *Abrams v. Ciba Specialty Chemicals Corp.*, 663 F. Supp.2d 1220, 1232 n.16 (S.D. Ala. 2009) ("new arguments are impermissible in reply briefs"); *Evans v. Infirmary Health Services, Inc.*, 634 F. Supp.2d 1276, 1285 n.14 (S.D. Ala. 2009) ("this Court's general practice is not to consider new arguments raised in a reply brief").

(rather than the $8.50 paid to Anderson), and when he became a permanent employee in March 2008 Sharpe received a raise to just $9.00 per hour (rather than the $9.50 paid to Anderson). So for Sharpe's first five months on the job (until he finally received a raise to $9.50 in May 2008), he was consistently paid $0.50 per hour less than Anderson was during Anderson's first five months on the job. Defendant's records show that both Sharpe and Anderson were classified as laborers during that period. (Plaintiff's Exh. 11.)

Defendant's response is twofold. First, according to GSG, Sharpe should be barred under Rule 37(c), Fed.R.Civ.P., from relying on Anderson as a comparator because he did not identify him as such in his original discovery responses. (Defendant's Exh. M, at #8.) This contention is unavailing. Rule 37(c) provides that if a party fails to provide information in a timely manner as required by the Federal Rules of Civil Procedure, "the party is not allowed to use that information … on a motion, at a hearing, or at trial, unless the failure was substantially justified *or is harmless*." Rule 37(c)(1) (emphasis added).[27] The Court is satisfied that no prejudice has befallen GSG by virtue of plaintiff's failure to identify Anderson as a comparator in his discovery responses. After all, during plaintiff's deposition taken on September 20, 2010, defense counsel asked Sharpe to identify the white employees he supervised who were paid more than he was. In response, Sharpe identified both Anderson and Brown, after which defense counsel asked him several follow-up questions about Anderson. (Sharpe Dep., at 65-66.)[28] Thus, defendant knew that Sharpe had identified Anderson as a comparator for his disparate pay claims some two months before defendant filed its Motion for Summary Judgment. Under the circumstances, plaintiff's failure formally to amend his discovery responses to reiterate the

---

[27]     *See also OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*, 549 F.3d 1344, 1363 (11th Cir. 2008) ("Under Rule 37(c)(1), a district court clearly has authority to exclude [a witness]'s testimony where a party has failed to comply with Rule 26(a) unless the failure is substantially justified or is harmless.").

[28]     To be precise, Sharpe said that the comparators were Brown and "[t]his guy named Matt …. I don't know his last name. His name is matt," and identified "Matt" as a chemical pourer on the BRG side of the operation. (Sharpe Dep., at 65-66.) Defendant's own records show just two employees named Matt working on the BRG side during 2008 and/or 2009, and that only one of those Matts (Matt Anderson) earned more than $8.00 per hour. (Plaintiff's Exh. 11.) As such, it was a simple matter for defendant to extrapolate from Sharpe's deposition testimony that Anderson was indeed the comparator in question.

disclosure of Anderson as a comparator is harmless because defendant already knew plaintiff had identified Anderson as a comparator for his wage claim. Accordingly, Rule 37(c)(1) does not restrict Sharpe from relying on this evidence for summary judgment purposes.

On the merits, GSG's only argument about Anderson is that, because their start dates and raises were staggered, at no given point in time was Anderson being paid a higher wage than Sharpe was receiving. This analysis glosses over a clear disparity. The record shows that when Sharpe started working for defendant in December 2007, he was paid $8.00 per hour. When Anderson started working for defendant in May 2008, he was paid $8.50 per hour. When Sharpe became a permanent employee in March 2008, he was paid $9.00 per hour. When Anderson became a permanent employee in August 2008, he was paid $9.50 per hour. Thus, at identical points of their employment (in terms of service time and temporary/permanent status), Anderson was consistently paid more than Sharpe. Although defendant insists that this kind of claim should not be actionable wage discrimination under Title VII, it does not identify a single authority that supports that proposition. Nor would this distinction make sense. How is it any less discriminatory for an employer to hire black employees at 50 cents-per-hour less than white employees, when their start dates are staggered by five months, than for an employer to pay a particular black employee 50 cents less than it pays a particular white employee at a particular moment in time? There is no logical difference between the two scenarios that the Court can perceive, and defendant fails to identify any legal support for its contention that only the latter (and not the former) can establish a *prima facie* case of wage discrimination.[29] For the reasons stated, the Court finds that Sharpe has adequately shown that Anderson qualifies as a comparator for purposes of his *prima facie* case.

Defendant makes no further arguments concerning Anderson. It does not offer a legitimate nondiscriminatory explanation for paying Sharpe less than Anderson at similar points of their employment at GSG/BRG. Because defendant does not take issue with Sharpe's ability to satisfy the other prongs of his *prima facie* burden, the burden shifts to GSG to "offer

---

[29] It is true, of course, that shifting pay scales might nullify the comparative value of the "staggered" situation. For example, if an employer hires a black employee at $10.00 per hour, then raises its pay scale for new hires across the board by $1.00 before hiring a white employee at $11.00 per hour, the two workers would not be similarly situated. But the record is devoid of any such evidence of systemic intervening pay scale changes at GSG.

legitimate, nondiscriminatory reasons for the employment action to rebut the presumption" of discrimination created by plaintiff's *prima facie* showing. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998). Under the *McDonnell Douglas* test, a defendant's burden of production is light, but it "is not so ethereal as to be nonexistent." *Hollingshead v. Windley*, 2008 WL 4809221, *9 (S.D. Ala. Oct. 31, 2008); *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55, 101 S.Ct. 1089 (1981) (to show a legitimate nondiscriminatory reason, "defendant must clearly set forth, through the introduction of admissible evidence, the reasons for" the challenged personnel decision). On this record, the Court has no inkling why defendant paid Sharpe less than a comparable white employee (Anderson) at the same stage of their employment because defendant has made no attempt to explain its decision through record evidence. Accordingly, defendant has not met its burden of production, and the Motion for Summary Judgment is **denied** with respect to plaintiff's claim of wage discrimination comparing himself to Matt Anderson.

### 2. *Justin Brown as Comparator.*

The other comparator on whom Sharpe relies for his disparate pay claim is Justin Brown, whom defendant rehired as a laborer on the BRG line in January 2009 at a starting wage of $10.00. At that time, Sharpe's pay was $9.75 per hour; thus, defendant paid Brown more than both Sharpe's starting wage of $8.00 per hour and his then-current wage of $9.75. The record shows that defendant increased Brown's pay to $10.35 in April 2009, at which time Sharpe received a raise to just $9.85 per hour, for a 50-cent differential.

Defendant's initial objection to plaintiff's designation of Brown as a comparator is that the two are not similarly situated in terms of experience. As stated *supra*, however, a *prima facie* case of disparate pay does not necessitate a showing that the two workers are identical in all respects other than race; rather, a comparator in a Title VII wage case is established so long as the plaintiff shows that he "occupies a job similar to that of higher paid" persons outside the protected class. *Meeks*, 15 F.3d at 1019; *see also Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 n.18 (11th Cir. 1992) (in pay discrimination context, "[f]actors such as experience and education operate as a defense to liability rather as part of a plaintiff's *prima facie* case"). That criterion is unequivocally satisfied here. Defendant's records reflect that both Brown and Sharpe were laborers on the BRG line in early 2009, and that Brown was paid more.

Accordingly, defendant's assertion that plaintiff cannot make a *prima facie* case of wage discrimination because Brown is not a similarly situated comparator is not well taken.

With respect to Brown (unlike Anderson), defendant continues with the *McDonnell Douglas* analysis by proffering a legitimate nondiscriminatory reason for paying Brown a higher wage than Sharpe. According to defendant's evidence, Woods (in consultation with Cotton) decided to pay Brown a higher starting wage than is typically granted to new laborers because Brown had previously worked for GSG as a supervisor with plant-wide responsibilities, had proven himself to be dependable and trustworthy in that stint of employment, and had left on good terms. Thus, defendant explains that it paid Brown more than Sharpe because Brown possessed a sterling reputation for being a "good dependable solid person" and a "go-getter" with experience in supervising plant-wide operations for GSG's business, albeit not on the particular BRG line for which he was rehired in 2009. This showing plainly suffices to satisfy defendant's modest burden of production in the *McDonnell Douglas* analysis. *See generally Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) ("To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.") (citations omitted).

Defendant having come forward with a legitimate nondiscriminatory reason for the challenged action, "the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." *Crawford*, 529 F.3d at 976; *see also Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (once employer articulates reason, "the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason ... is a pretext for illegal discrimination") (citation omitted). A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks*, 446 F.3d at 1163 (quotation omitted). If the "indirect" option is chosen, then the plaintiff's evidence "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels v. Alabama Independent School System*, 408 F.3d 763, 771 (11th Cir.

2005) (quotation omitted).[30]  In that event, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. ... Quarreling with that reason is not sufficient."  *Wilson*, 376 F.3d at 1088; *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008) ("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason … was pretextual.").

> To demonstrate pretext, Sharpe offers a combination of direct and indirect evidence. The direct evidence includes proof that, at unspecified times, Woods (the key decisionmaker for that pay differential) referred to African-American employees as "monkeys," told a white employee (Justin Brown) that Woods "was looking for people like [Brown] to change the face of the company," and disparagingly referred to a black employee as "this."  The law is clear that, in a circumstantial proof case, "such comments may provide circumstantial evidence to support an inference of discrimination." *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998).  Of course, the record is lacking important details concerning the context and timing of these remarks, so this direct evidence may be insufficient to show pretext by itself.[31]  But this

---

[30]  *See also Rioux*, 520 F.3d at 1278 ("The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons."); *Jackson v. State of Alabama State Tenure Com'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (to demonstrate pretext, a plaintiff must show that the employer's offered reason was not the true reason for its decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").

[31]  For instance, it is possible that these comments may be merely isolated, stray remarks made over a protracted timespan, divorced in time and circumstance from the challenged employment actions here.  *See, e.g., Ash v. Tyson Foods, Inc.*, 2010 WL 3244920, *13-14 (11th Cir. Aug. 17, 2010) (plant manager's use of the term "boy" to refer to African-American employee was "ambiguous stray remark[] not uttered in the context of the decisions at issue and … not sufficient circumstantial evidence of bias to provide a reasonable basis for a finding of racial discrimination") (citation omitted).  Without context and timeframe, it is impossible to pin down precisely how significant these comments are to the pretext analysis.  That said, however, defendant's attempt to spin the "monkey" remark into an innocuous variant of the well-traveled "monkey-on-the-back" idiom is dubious at best.  It is difficult to fathom that a white plant manager calling black subordinates "monkeys" (without the "on-the-back" modifier) in the workplace could ever reasonably be viewed as anything other than a racial slur, given the highly charged and inflammatory nature of that term.

evidence is germane to the pretext inquiry nonetheless. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1362 (11th Cir. 1999) (deeming decisionmaker's comment that he wanted "aggressive, young men" to be "a significant piece of circumstantial evidence" in the pretext analysis); *Ross*, 146 F.3d at 1291-92 (decisionmakers' statements, long before challenged action, referring to African-American employee as "that one over there" and stating "I never seen as many blacks in this building except in a Tarzan movie," along with other record evidence, support finding of pretext).

Plaintiff's pretext evidence is not limited to purported statements of racial animus by Woods. Rather, that evidence must be considered in conjunction with plaintiff's indirect evidence of pretext. To the extent that GSG maintains it paid Brown more than Sharpe because of Brown's prior supervisory experience, plaintiff points out that Brown was not hired as a supervisor in January 2009, but was instead hired as an entry-level laborer on the BRG line, a line on which he had never worked before. Plaintiff's evidence is that Sharpe trained Brown on the BRG line, and effectively supervised Brown in Sharpe's capacity as leadman, at least until defendant flip-flopped their roles by promoting Brown to the very position that Sharpe had previously held and demoting/transferring Sharpe to an undesirable glass-bagging job.[32] From these record facts, a reasonable factfinder could conclude that Brown's previous supervisory experience was irrelevant to the job for which defendant hired him, such that it cannot plausibly justify GSG paying Brown more than the African-American plaintiff who trained and supervised him in that job. *See Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 598-99 (11th Cir. 1994) ("we have no difficulty agreeing that plaintiff can survive summary judgment by pointing to [fact that defendant paid subordinates more than plaintiff] as proof of defendants' intentional discrimination").[33]

---

[32] Indeed, Brown himself acknowledges that he "was trained by Lewis Sharpe when [he] began in the Bullet Resistant Glass Line" and that Sharpe "trained [him] by showing [him] every part of the BRG process." (Plaintiff's Exh. 6, at ¶¶ 2-3.) Brown also confirms that he "took over Lewis Sharpe's position as Leadman in the BRG line when Plant Manager Mark Woods moved Lewis Sharp[e] to a position bagging glass," which was more physically demanding than the leadman job. (*Id.*, ¶¶ 4, 9.)

[33] The same can be said of defendant's other proffered explanation for the pay differential, namely Brown's reputation as a dependable supervisor. (Doc. 41-1, at 24-25.) Plaintiff's evidence is that he enjoyed a similar reputation. After all, co-worker Matt Anderson (Continued)

In short, on this record, GSG's stated reasons for the challenged personnel action are suspect, and genuine issues of fact linger. Plaintiff has met his burden of showing such weaknesses and implausibilities in defendant's proffered reasons for compensating him at a lower rate than Justin Brown that a reasonable factfinder could deem those reasons unworthy of credence, and could find that race discrimination was the real reason for the challenged personnel action. Defendant's Motion for Summary Judgment is **denied** as to the Title VII pay discrimination cause of action.

### D.     The Layoff and Recall Claims.

Finally, GSG seeks entry of summary judgment on Sharpe's discrimination and retaliation claims pertaining to his layoff in June 2009 and his subsequent recall in September 2009 (two months after most of his colleagues – including all of his white colleagues – had been recalled to work). In lieu of a rigorous application of *McDonnell Douglas* principles to these claims, defendant posits four discrete arguments in favor of dismissal. The Court will consider each in turn.

#### 1.     Causal Link between Protected Activity and Adverse Action.

First, defendant maintains that neither the layoff nor the recall decisions are actionable on a retaliation theory because plaintiff cannot show a causal connection between his protected activity and those adverse actions. To establish a *prima facie* case of retaliation, Sharpe must show that "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the

---

described Sharpe as "a good worker." (Plaintiff's Exh. 7, ¶ 10.) And Sharpe's supervisor, Josh Batchelor, testified that "[w]hat I saw was always good work" from Sharpe, and that if Batchelor "asked him to do something, then he'd do it." (Batchelor Dep., at 25.) Batchelor also said that there was a time when Sharpe helped out more than others on the BRG line. (*Id.* at 63.) This evidence creates a reasonable inference that Sharpe also enjoyed a reputation of being dependable and trustworthy, just as did Brown, such that Brown's reputation could not reasonably explain away their pay differential. Finally, in its reply brief, defendant argues for the first time that Brown was paid more than Sharpe because of Brown's "past wage." (Doc. 52, at 10.) But the only nondiscriminatory reasons identified in defendant's principal brief were Brown's "past experience and reputation as a supervisor at GSG." (Doc. 41-1, at 24.) Defendant is not permitted to set forth new reasons for the challenged personnel action for the first time in a reply brief, when it is too late for plaintiff to respond; therefore, the Court declines to address this explanation.

adverse action." *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009); *see also Butler*, 536 F.3d at 1212-13 ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.") (citation omitted). With respect to the causal link element, the law is clear that "close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008). Defendant argues that there is insufficient temporal proximity to establish a causal link here, inasmuch as the EEOC Charge was filed in February 2009 and Sharpe's layoff did not occur until early July 2009, more than three months after defendant learned of the Charge in late February. Case authorities support the proposition that, without more, a three-month period between protected activity and adverse action is insufficient to show a causal connection. *See, e.g., Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."); *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) (three month period, by itself, "does not allow a reasonable inference of a causal relation between the protected expression and the adverse action").

"But close temporal proximity is not the only means by which a plaintiff can establish a causal connection." *Pears*, 645 F. Supp.2d at 1095-96; *see also Thomas*, 506 F.3d at 1364 (explaining that substantial delay does not establish causal link "in the absence of other evidence tending to show causation"). After all, the "causal link" element is construed "broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (citations and quotation marks omitted); *see Boandl v. Geithner*, --- F. Supp.2d ----, 2010 WL 4321573, *13 (E.D. Pa. Nov. 2, 2010) (plaintiff can show causal connection through "timing plus other evidence, such as evidence that the employer engaged in a 'pattern of antagonism' with the plaintiff"); *Uddin v. City of New York*, 427 F. Supp.2d 414, 432 (S.D.N.Y. 2006) (causal connection can be shown by evidence such as temporal proximity, proof that similarly situated employees were treated differently, or "direct proof of retaliatory animus").

Here, Sharpe has come forward with evidence that Mark Woods, who made the layoff and recall decisions and who had actual knowledge of his EEOC Charge and his internal race discrimination complaints, viewed Sharpe as "a complainer" and based his earlier decision to

transfer Sharpe to the less desirable bagging assignment in part on that fact. (Woods Dep., at 279-80.) A reasonable factfinder could construe Woods' "complainer" statement as one evincing retaliatory animus, particularly where it had been a motivating force for at least one of the alleged materially adverse actions (*i.e.*, the transfer to the bagging area). Thus, the evidence supports a reasonable inference that Woods was predisposed against Sharpe because Sharpe had complained about matters including race discrimination. That evidence, in combination with the passage of three months between notice of EEOC Charge and layoff, and the chain of intervening retaliatory conduct (including the April 2009 write-up and the public humiliation of Sharpe) satisfies Sharpe's light burden of showing as part of his *prima facie* case that the protected activity and layoff were not "wholly unrelated."[34] In short, the Court finds that Sharpe's retaliation claims pertaining to the layoff and recall do not fail at the *prima facie* stage for want of evidence of a causal connection.[35]

---

[34] Besides, it does not appear that Sharpe's protected activity ceased with the filing of his EEOC Charge. Woods testified that after Sharpe was transferred to the bagging area, he "continued to complain … [a]bout pay" internally. (Woods Dep., at 281.) This is significant because the record is clear that Sharpe complained both internally and to the EEOC that GSG's pay practices were racially discriminatory. So, if he continued to complain about pay after that EEOC Charge, as Woods' testimony reflects, then Sharpe was continuing to complain about an employment practice that he had attributed to race discrimination, suggesting that those continued complaints were themselves protected activities. Inasmuch as it appears that Sharpe's complaints did not dissipate months before the layoff, but instead persisted, there is sufficient temporal proximity between those complaints (which were a continuation of his EEOC Charge and previous internal complaints of discrimination) to satisfy the causal link requirement.

[35] To the extent that GSG contends the retaliation claims as to Sharpe's delayed recall to work lack a causal connection, that argument is unpersuasive for the same reasons identified *supra* with respect to the layoff. Contrary to defendant's suggestion, the passage of time between layoff and recall does not weaken Sharpe's causal connection argument. Indeed, the entire basis of Sharpe's retaliation claim pertaining to the recall is that defendant wrongfully delayed bringing him back to work until long after most of his colleagues had returned. Besides, the sequence of Sharpe's demotion, transfer, April 2009 bogus write-up and humiliating delivery of performance evaluation, layoff and delayed recall over a period of months after he complained of race discrimination gives rise to a reasonable inference of a pattern of retaliatory conduct, of which the layoff and delayed recall are simply links in the chain. "[C]ourts have routinely found a causal connection even as to retaliatory acts occurring long after the protected activity, where those events are linked by a chain of intervening retaliatory acts." *Pears*, 645 F. Supp.2d at 1096 (citing authorities). Such is the case here.

## 2.    *Whether Delay of Recall is an Adverse Employment Action.*

Second, defendant contends that Sharpe cannot pursue retaliation or discrimination claims predicated on his recall because "[h]is re-hire at his former pay level and position cannot constitute an adverse employment action for purposes of a discrimination claim."  (Doc. 41-1, at 27.)  Defendant reasons that Sharpe's recall "only affected the terms and conditions of his employment positively because he went from being un-employed to employed."  (*Id.*)

This argument misses the point.  Sharpe is not objecting to GSG's decision to recall him; rather, he is complaining that defendant delayed from early June 2009 until late September 2009 to do so, even after recalling the vast majority of his laid-off colleagues in July 2009.  Simply put, it is defendant's failure to recall Sharpe in a timely manner, rather than the recall itself, that forms the backbone of this claim.[36]  The three-month span in which Sharpe was not working was plainly materially adverse to him because he was sitting home and not being paid even after defendant restored most of his co-workers to their jobs.  Viewed in that light, the delay attendant to defendant's recall of Sharpe is unquestionably an adverse employment action for purposes of Title VII discrimination and retaliation claims.  *See Jones v. Alabama Power Co.*, 2008 WL 2485590, *4 (11th Cir. June 23, 2008) ("employer's failure to recall or rehire an employee is undoubtedly an adverse employment action") (quotation marks omitted); *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 766 (1st Cir. 2010) ("failure[] to recall after layoff … can constitute adverse employment actions"); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1141 (5th Cir. 1981) ("Defendant's failure to rehire the plaintiff was undoubtedly an adverse employment action" for purposes of Title VII *prima facie* case analysis); *Martin v. Manna Pro Corp.*, 2001 WL 1230927, *2 (4th Cir. Oct. 16, 2001) ("a failure to recall can be an adverse employment action that accrues separate from the initial adverse employment action, the layoff"); *LaForge v. Howard*, 2002 WL 818292, *6 (D.N.H. Apr. 30, 2002) ("failure to recall

---

[36]    Where discriminatory implementation of recall is alleged, courts have required plaintiffs to show as a *prima facie* case that the plaintiff belongs to a minority, that the plaintiff is qualified for the job and satisfied its normal requirements, that a recall was conducted following a layoff, that the plaintiff was eligible for layoff but not recalled (or not recalled in a timely manner), and that the plaintiff was treated less favorably than non-minority former employees as to recall.  *See State Div. of Human Rights v. Ozone Industries, Inc.*, 610 F. Supp. 438, 440-41 (S.D.N.Y. 1985).  The evidence supports all of these elements here.

after layoffs … may constitute adverse employment actions"). Defendant's contention to the contrary is meritless, as a matter of law.[37]

### 3. *Legitimate Nondiscriminatory Reasons for Layoff and Recall.*

Third, defendant argues that even if Sharpe can make a *prima facie* case of discrimination or retaliation concerning the layoff and untimely recall, GSG has legitimate nondiscriminatory reasons for placing him on temporary layoff in June 2009 and waiting to recall him from layoff until September 2009. In particular, defense counsel states that "it is clear that the lay-off and subsequent re-hire were based on work slow-downs and Sharpe's past disciplinary issues." (Doc. 41-1, at 29.) In support of this assertion, defendant offers evidence that the June 2009 layoff was imposed because of "slack in work" and that Sharpe indeed had certain disciplinary problems and had accrued unfavorable incident reports during his employment for defendant.

The threshold problem is that GSG does not proffer evidence showing why it chose to lay off Sharpe (as opposed to some other employee) and why it waited so long before recalling him.[38] With regard to the first point, simply saying that there were valid business reasons for conducting a layoff says nothing about the selection process for that layoff or why a particular worker was or was not selected. *See generally Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 51 (1st Cir. 2010) ("An employer may, of course, exercise its business judgment to eliminate positions as part of a … reduction in force, even if the individuals in those positions have engaged in protected activity or are members of protected groups. … However, an

---

[37]    Defendant's reliance on *Watson v. Alabama Farmers Coop., Inc.*, 2009 WL 962667 (11th Cir. Apr. 10, 2009), is unavailing. *Watson* is not a layoff/recall case, but is instead a fire/rehire case. The plaintiff in *Watson* was not complaining about the duration of his unemployment, but was instead complaining about the assignment he received upon being rehired, which is distinct and distinguishable from Sharpe's claim that GSG tarried too long in restoring him to his job. A recall from layoff is simply not equivalent to a rehire of a fired worker. In any event, defendant's protestation that "Sharpe was no longer entitled to employment at GSG after the layoff" (doc. 41-1, at 27) rings hollow since defendant's own records show that every one of the 32 employees it laid off in early June 2009 were subsequently recalled (although a couple of them declined to come back). (*See* Plaintiff's Exh. 24.)

[38]    Instead, defendant presents evidence concerning Sharpe's seniority vis a vis other laid-off and recalled employees. (Doc. 41-1, at 16.) But this evidence is entirely unilluminating in the absence of proof (which defendant has not offered) that GSG in fact used seniority as a criterion for either layoff or recall decisions. On this record, seniority data lacks probative value because there is no evidence that seniority mattered one whit in the layoff / recall calculus.

employer may not use … 'layoff' as a convenient excuse for terminating an employee on a discriminatory or retaliatory basis.") (citations omitted).  Stated differently, defendant's evidence of a lack of customer orders may well justify the June 2009 layoff, but it says nothing about why Sharpe specifically was chosen for layoff.  Viewed in the light most favorable to plaintiff, the record shows that Woods made layoff selection decisions in his unfettered and unchecked discretion, without oversight or approval from anyone else, and without formal policies, written criteria, or other operational directives to guide the exercise of his discretion.  (Woods Dep., at 318-19.)  But nowhere in the record is there testimony from Woods articulating his reasons for selecting Sharpe for layoff.[39]

With regard to the second point (*i.e.*, the paucity of evidence explaining the timing of recall), defendant attempts to argue that Sharpe's treatment with respect to the layoff and the timing of his recall was prompted by his disciplinary history with GSG.  But defendant fails to point to any statement by Woods (the decisionmaker for the layoff and rehire) indicating that Sharpe's disciplinary record had any bearing on his decisions.  To show that plaintiff had a history of write-ups at GSG is not equivalent to showing that Woods relied on such write-ups as his reason for including Sharpe in the June 2009 layoff and making Sharpe one of the very last employees to be recalled to work.  As things stand, then, the Court has only counsel's representation, and no record evidence, showing why these adverse actions were taken against Sharpe.  That is not sufficient to satisfy defendant's burden of production on summary judgment. *See Hollingshead*, 2008 WL 4809221 at *10 ("merely asserting that the chosen applicants … were qualified, with no evidence or indication that these recommenders deemed the successful applicants more qualified than plaintiff … does not amount to a legitimate nondiscriminatory reason for the non-selection of" plaintiff); *Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008) ("Unadorned representations of counsel in a summary judgment brief

---

[39]     To the contrary, the record establishes substantial grounds for questioning the manner in which Woods wielded his discretion in orchestrating these layoffs.  For example, Justin Brown states that when GSG laid off employees on the BRG line, Woods did not lay off Brown (who is white), but instead reassigned him to a different line where he had never worked before, bumping a more senior African-American employee out of the job instead.  (Plaintiff's Exh. 6, ¶ 8.)  Such evidence reinforces the notion that Woods was not implementing the layoff in accordance with a fixed, neutral set of principles or guidelines, but was instead doing so in whatever arbitrary (or worse) manner he saw fit.

are not a substitute for appropriate record evidence."); Rule 56(c)(1)(A), Fed.R.Civ.P. (litigant on summary judgment asserting that particular facts are or are not disputed "must support the assertion by … citing to ***particular parts of materials in the record***") (emphasis added).

Simply put, the record (as cited by defendant in its briefs) does not identify any evidence explaining Sharpe's inclusion in the June 2009 layoff or his status as one of the very last employees to be recalled from such layoff, months after dozens of his peers (and all of his white peers) had been restored to work. Accordingly, defendant has not satisfied its burden of production, and is not entitled to summary judgment on these claims.

### 4. *"Same Actor" Defense.*

Fourth and finally, defendant contends that it is entitled to summary judgment because the same decisionmaker (Woods) decided to layoff and to rehire Sharpe. The Eleventh Circuit has recognized that such "same actor" evidence "constitutes evidence that a jury may consider in deciding the ultimate issue of intentional discrimination. Evidence that the same actor both hired and fired the plaintiff, in some circumstances, may help to convince a jury that the defendant's proffered legitimate reasons for its decision are worthy of belief." *Williams v. Vitro Services Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998).

The "same actor" line of authority does not bolster defendant's Rule 56 Motion. This is not a case where the same actor is alleged to have hired (a positive personnel action) and subsequently fired (a negative personnel action) the plaintiff. Rather, plaintiff's evidence is that Woods placed Sharpe on temporary layoff (a negative personnel action) and delayed for a period of months before recalling Sharpe (which delay was also a negative personnel action). Defendant does not identify a single authority in which the Eleventh Circuit has extended the "same actor" inference to a circumstances of layoff, followed by delayed recall, nor does any such extension of the doctrine appear logical. Again, the record reflects that GSG ultimately recalled every single employee that it laid off in June 2009. Defendant's suggestion that Woods' decision to recall Sharpe (albeit long after most of his colleagues had been recalled) somehow dissipates the taint of the previous adverse decision to lay off Sharpe in the first place does not appear to be grounded in logic or law. Even if the "same actor" inference did apply here, it would not entitle GSG to summary judgment because the law is clear that "it is the province of the jury rather than the court … to determine whether the inference created by 'same actor' is

strong enough" for the defendant to carry the day. *Williams*, 144 F.3d at 1443 (declining to accord to "same actor" evidence a "presumption that discrimination necessarily was absent").

**VI.    Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.    Defendant's Motion to Strike (doc. 51) is **denied**; and

2.    Defendant's Motion for Summary Judgment (doc. 41) is **denied** in its entirety.


DONE and ORDERED this 2nd day of February, 2011.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE